I'm going to do a quick recording of what's going to happen. Once I can, I'm going to do some stuff at Gilead Sciences. I understand that the pirates, you know, I guess, are going to try to open the gates. That's right, Karen. We're going to do six minutes over to the government. We will have nine minutes. That's correct. I like the longitude for it, but also when this clock hits eight, I'll try to let you know. We're going to do seven now, and then you'll have two for the run. Yes, sir. That's what I'll try for you. Can you respond for me, keeping you on time? Certainly. Thank you. The Fossil Land Act clearly applies when a defendant supplies nonconforming or inferior goods to the government and charges full price. And that is exactly this case. The allegations in the second amendment complaints state that the defendant, Gilead Sciences, provided drugs containing active pharmaceutical ingredient, the most important part of the drug, sourced from an unapproved, unregistered facility in China that was incapable of producing product of adequate quality. The result is that the government spent billions of dollars, both through direct purchase programs and through reimbursement programs like Medicaid, Medicare, the Federal Employees Health Benefit Plan, TRICARE, which is a program for the DOD, all on these inferior drugs. A pretty long line of this Court's cases show that this is the archetypical False Claims Act case. We, in our briefs, have identified three different theories for exactly why these things are false. But before we jump into them, maybe I can just focus on what I think is the crux of the legal error in the district court's reasoning. And that is its conclusion that because some of the false statements here were made to the FDA, the subsequent claims for payment are not actionable under the False Claims Act. And that, we think, just simply cannot be correct. The district court's rationale was that the FDA is not the paying agency in Medicare and Medicaid. For example, CMS are. But that's not even true. As we know, both we and the government have explained, both CMS and the FDA are part of the Department of Health and Human Services. They're both exercising the power of the Secretary of Health and Human Services. But that's not why the argument is legally wrong. That's just why it actually makes no sense. Other agencies, of course, like the Department of Veterans Affairs, which are buying these drugs, are not part of HHS, but it still makes no sense there. Because the point of our argument, and this is a point that the court embraced fully in the Hendo case, is that when you obtain the approval to sell product or obtain government money by fraud, you obtain eligibility for that money by fraud. A subsequent claim for payment, even if that claim is not itself false or fraudulent, becomes a false claim. That's the Hendo case. If you recall in that case, the University of Phoenix obtained eligibility for subsidies from the Department of Education. And there were two different kinds of subsidies. The first were Pell Grants. These were grants paid directly by the federal government to the university. Their department was the paying agency. The second type of subsidy it obtained eligibility for was under the Federal Family Education Loan Program. These are the Stafford Loans, subsidized loans given by private lenders to students. By certifying its compliance with the Department of Education's terms, the University of Phoenix managed to get private lenders subsidized interest rates. Those loans were insured by state agencies, not by the federal government at all. And then they were reinsured finally at the back end by the federal government. But there is no sense in which the Department of Education was the paying agency for the FFEL loans. Nevertheless, as the court said, no problem at all. That's actionable. This case is quite the same. In this case, the false statement. So before we get to the false statement that speaks to the FDA, there are a certain percentage of drugs that get sold that are outside of the scope of any FDA approval whatsoever. That is prior to the time it filed its prior approval supplement to modify its new drug application. There is no straight-faced argument that drugs containing API from Synthetics China were within the scope of that approval. Similarly, we have alleged in our complaint and our brief, and Gilead has not disputed in this appeal, that Synthetics China plant 203 needed its own PAS, which was never filed. And so all of those drugs are just outside the scope of any government approval whatsoever. Then there's our second theory, which is that Gilead obtained just the unproven aspects of the DNA identity. I think they came to the conclusion that it was a drug. Now, in which sense? So Gilead has to do with what's known as a contagious chain of unproven evidence? I think so, Your Honor. If you go to- Wait, is there something like that? Yes, Your Honor. So we have right now what we already have, and you'll find this at ERG24, is there's a spreadsheet that says it's a six-part second amended complaint, which shows the manufacturing date of every batch of drugs from Synthetics China. And there's a pretty sophisticated tracking system. Now, part of the allegations in this case is that Gilead masked the origin of certain drug materials, so to the extent we're getting information from Gilead, there may be accuracy problems. But that's all a problem that we can resolve in discovery. There will be third parties who we may be able to get that information from as well. But as a general matter, yes, drugs are tracked very carefully as they move through the production cycle and through U.S. commerce. And so we should be able to find that information. What do you make of the fact that the government has continued to make payments, despite the fact that you have indicated there were problems with what Gilead was doing? Yeah, so this argument, I think, goes at most to the materiality of the deception here. And here's where the facts in the complaint show. The fact that the complaint itself relates mostly to actions that happened up until 2011. In late 2011, Gilead made Synthetics China an active supplier, basically stopped sourcing additional API from them. That's what the complaint alleges. And even so, it responds in part to criticism by the FDA of contamination in Gilead product. Now, our complaint originally was filed in 2010. The government declined to intervene in 2013, and the case was concealed and moved forward. It's actually not surprising at all that the government pays for uncontaminated Intriva, Truvada, and Natripla. We agree with Gilead that these are important drugs, and that is precisely why they have to be paid properly. The fact that the FDA has withdrawn approval for these medicines and has subjected these patient populations to public health risks is obviously the right decision if they're being made correctly now. So your claim is that they paid for adulterated. That's correct, Your Honor. But they continue to keep paying for all three of those drugs, right? Well, that's correct, Your Honor, but we believe, we don't know for sure, but we don't have any reason to believe that the adulteration and contamination are continuing in these drugs or continued past 2011. And so the continued payments, we don't think, say anything about whether the government was happy to pay full price for adulterated, contaminated drugs. And in any event, the argument I made before, which is that they just simply cannot pay for drugs that are not within the scope of NDA approval, that argument is that they all continue to be approved drugs. The rule of them was going like, no, I don't think we're going to actually take them. So, Your Honor, I see I have the time that I wanted to stop, but I do want to say a few words on this question because it's terribly important. Drug approval is an approval of essentially the concept of the drug, the design of the drug. It's not an approval of every individual pill that the manufacturer says embodies that concept. If, as we have alleged, I'll certainly take that as an interpretation, although one that's incorporated into a purchasing contract. So if a purchasing contract says we want to buy 1,000 capsules of Atripla, for example, it cannot be the case that if the manufacturer hands them a bottle of 1,000 capsules of Tylenol, and says this is Atripla, that because Atripla has FDA approval, the manufacturer is off the hook. Similarly, if what the manufacturer hands them is an adulterated knockoff of Atripla, the same must be true, whether it's an antiviral or not. And I don't see how the opposite could be possibly true. At the moment, I'll rest. Thank you. AMCC Court, Your Honor. Second Douglas Lutter of the United States Department of Justice. Here is a meeting to represent the interests of the United States with me at counsel's table. This is Assistant U.S. Attorney Sarah Winslow from here at San Francisco. The government is here as an advocate in support. I just want to make two very important but limited points about the district court's penal rulings, which we think are incorrect and cause a serious problem for the United States in its enforcement of the False Claims Act. If I may, I'd like to go right to the questions that Judge Moore and Judge Teshim were asking about. Well, what about the fact that FDA has not revoked an approval for these drugs, and, indeed, the government in a wide variety of programs, as my friend Mr. Singh pointed out, continues to pay for them. I'm not going to speak about what specifically happened in this case. I'm speaking hypothetically now that there could be all sorts of reasons why the government would continue to pay for and not revoke in a situation such as this. For example, suppose there's a situation where the whistleblower comes forward and the government is still investigating the matter. And while it's investigating, it is continuing to pay. Or you could have a situation, very common probably, where lots of the drug are manufactured and distributed, and the allocations don't even come out until after those drugs are long gone in the stream of commerce. There's no way that they can be retrieved. And, in fact, let's say it's years later, and suppose the government's investigation and discussions with the defendant company, any problems have now been resolved. Well, under those circumstances, there wouldn't be any reason for the government to revoke the approval at that point. And there wouldn't be any reason for the government to stop paying, because the drugs at that point, which would be some years later, are still being manufactured properly and are the proper product. So these are various circumstances that could arise. All they point out is these are matters of proof to be determined, most likely at trial. It's not a legal ground to say we're going to dismiss the relator's complaint because the government has left the product on the market or is still paying. That can't be right. And we're not commenting here on whether the relator's case, One other point I want to hit, because it is so important to us, is the district judge's conception that the product has to be worthless. And that is just not the law. This court, even the case of the V case, but in that case the court didn't hold that there was no cause of action unless the product was worthless. The court simply observed that in that case, that's what the allegations were. But that can't be the law, and here's why. When Congress passed the statute during the Civil War, what it was concerned about were products that determined military supplies that might, you know, leather fastenings, things like that, that might fall apart, say, three months later, after they had been procured by the Army, reused by the Union Army. Well, that simply means they weren't worthless. They provided several consequences. But they weren't what the government ordered, or supposed to have them. The government orders 100 new Humvees for the military and says they need to go 40 miles an hour and be able to forward a stream of six feet deep. And the defendant company produces one that goes 35 miles an hour and can forward a stream four feet deep. Well, those products are worthless. They're not what we ordered. They don't perform to what we really want and might be very useful in certain circumstances. But they're not worthless, but it's obviously still a violation of the False Claims Act. So several courts have used this term. It may be a valuable term in some cases, such as these, but it is clearly not a requirement of the False Claims Act. You won't find the language of it anywhere in the statute. The other point I want to make is such achievement. I mentioned prior holdings of this court. National wholesalers, by this court, is very keen ruling here. Because there, the court was dealing with a situation where the contractor pledged to provide a certain type of regulator to the government. It turned out they couldn't get that regulator. And so they disabled it on purpose and submitted a different product. Well, it turned out that product, the government found, did a darn good job. But it wasn't what we had ordered. This court reversed it. This court made clear that that stated a valid False Claims Act cause of action because the government, the taxpayers, did not get what they had ordered. And so this may go to the damages. In fact, we could even see in some circumstances the government has no damage. But there would still be penalties that might be appropriate. But it can't mean that as a matter of law, the case cannot go forward. I'd be happy to answer any questions that the court has. I agree completely with what my friends are saying about different agencies. It's just quite clear that if you defraud the FDA, HHS, and CMS, they're all the same agency, but you lie to the SBA or another entity but then end up billing the FDA, that can't be a ground for no cause of action because it can't turn on how the government is organized and different departments, department lines are put in. Thank you very much, Your Honors. I'm going to try to follow up. Good morning, Your Honors. Stephen Plosser for the Aptly Gilead Sciences. I'm going to start from the place where I think that Mr. Lederer and I can say this, particularly after the briefing, that deviations from the NDA and alleged manufacturing deficiencies don't make the product unapproved or ineligible for reimbursement. In fact, the law is clear that even adulterated medicines, adulterated medicines, must be paid for by the federal government unless the FDA withdraws approval. No court has ever ruled to the contrary. The Obie Care case in the Fourth Circuit explicitly ruled on this point, and it has been the guidance of the Food and Drug Administration for a long time, that even drugs that are adulterated have something wrong with the manufacturing process. That is incredibly common, and what the FDA's public guidance on this point says is that drugs that are adulterated doesn't mean there's anything wrong with them, and it advises patients and healthcare professionals to continue taking their medicines. Let me ask you about that. If the adulteration is arsenic, shards of glass, cement, you're saying, not too bad, you're just a pill, but the NDA's been issued, and unless it's remote, there's nothing you can do about it. Well, it depends. The answer is it depends. Let's talk about why this case is so easy to distinguish from natural wholesalers. Mr. Lederer's example. If there's a contract that says I will give you medicines that can have more than 0.5% arsenic and you deliver a medicine that has more than that, yes, that could possibly be a violation of the False Claims Act. This is such an easy case to distinguish. There is no contract in the record. There's nothing in there about what the specifications were. So Mr. Lederer's hypothetical about the Humvee, we don't have any of that here. The answer to your question, Your Honor, is yes. It is not uncommon for products to have small deviations, just at the type that Your Honor said, and what the FDA calibrates carefully the public health risk to make the determination about whether those products should continue to be taken by patients. The public health consequences of the Lederer's argument are enormous and would upset decades of the FDA's careful calibration. I know it sounds difficult to believe, but what the FDA is saying is these minor deviations in the trace amounts of arsenic are common in the production of these medicines, and it's the FDA's job to determine the materiality of, or you look at the contract to determine the materiality. So the answer to your question, Your Honor, is medicines that are adulterated. As a contract that says something different, the answer to your question is yes, they must continue to be reimbursed. Let me ask you this. I assume that you went to plant 202 and plant 203 because it was cheaper, right? I don't think there's anything in the record about that. A lot of these plants, Your Honor, have great expertise in developing these products. It's not just a question of price. Did Gilead lower the price it was charging the government once it went to those unauthorized 202 and 203? I don't think there's any evidence in the record about that either way, Your Honor. The point is that manufacturing deficiencies of this kind are non-material in the conditions of payment. I have a handout case, one which Mr. Singleton explicitly relied, since I have a pretty easy case to distinguish. Why? Because there the court found a breach of explicit contractual provision and an agreement at a regulatory standard. In that case, there was an explicit regulatory standard. Thou shalt not tell me X. They said X. I have something like a pretty easy case to understand about why a breach of a false claims act case. But here there's nothing in the record about what the standards are for these medicines absent a specific contractual provision on this point. And absent withdrawal from the FDA, the products must remain on the market unless they are, to use the knife circuits, unless they're worthless. The Seventh Circuit made this point as well and said, it's not just that they're worthless, they're worthless. But again, there's a big exception there, Your Honor. The court can move very narrowly here and affirm, because we don't have any contract, we don't have any specification, we don't have any description of how significant must be arsenic or cement particles. Well, let me ask you this. Justice Thomas wrote, we hold first that at least in certain circumstances, the implied false certification theory can be a basis for liability. Specifically, liability can attach when the defendant submits a plan for payment that makes specific representations about goods or services provided, but knowingly fails to disclose the defendant's noncompliance with the statutory, regulatory, or contractual requirement. Now, isn't that, in this case, you represent the pills, the three pills, are FDA approved when, in fact, there are ingredients in there that are not approved by the FDA? Doesn't make the law as clear on this point, Your Honor, does not make those products unapproved. And absent of contractual, some specifications, these NDAs, by the way, have specifications about all sorts of things. There's no allegation that, well, you say you didn't have .5 percent arsenic and you had .6. Absent some specific, absent tethering it to a specific provision in the contract, your lawyers can affirm the dismissal and still keep those doctrines in place, that in theory, yes, you know, if you make a material misrepresentation or if there's a violation of a material provision of the contract, the court can still harmonize what concerns Mr. Lederer in the government and affirm that, of course, he has a court case. Your letter says, you know, conseriality is rigorous. It's demanding you can decide on it under Rule 12. And it, of course, also talks about if the government keeps paying. Let me address that point for a second. Here are the complaints delivered in 2010 to the United States in the government's campaign, right? What Mr. Singh admitted was that the complaint alleges that the API, the active pharmaceutical ingredient, they allege, well, you kept using that until 2014, right? Government kept paying. But perhaps more importantly, the D'Agostino Court's first stroke in its post-Meskel bar case makes this point, and Judge Chen did too, that the leisure in this area, Your Honor, is that it's going to require the courts to second-guess the FDA about, well, might it be material, well, that arsenic doesn't look right to me. I think that arsenic is too much. But the FDA is the calibrator of this. They have an understanding about what's material in conjunction. Did you take action to make sterling, to make sterling, hoarding letters, and requiring it as, if you will, batches of medicine that you used to try to do that immediately? There was a hoarding letter, Your Honor, and there was what they called, like, two batches, I think. There's no way that it's not going to help debate for any of that. But Your Honor, that's exactly the point. The FDA can determine what it cannot do, Your Honor, of course, is withdraw replication. The FDA has lots of tools. They can inspect plans. They can ask for a recall. They can seize a product. They can seize a junction. They can write a hoarding letter, okay? But the fact that they didn't go beyond that or withdraw approval Excuse me? Well, according to the ultimate theist, but for different reasons, but according to the complaint, the API from SE, which is that Synthetics Trader, continued to be used even in 2014. And the key under ESCOBAR is not only did the government pay for it, which is certainly true, and a number of post-ESCOBAR courts, the D'Agostino case, a part of that. The D'Agostino case is key because it's obviously in the FDA. In the post-ESCOBAR case, it's very similar to this case. But it's also about how the FDA didn't exercise all of these weapons at their disposal. They exercised a couple of them, Your Honor, but they fell short of asking. You know, the government never said, hey, I'm not paying for those batches, despite knowing all that. So if the government knew about the hoarding letter, which it did because it issued the hoarding letter, it still continued to pay for the product and took a small regulatory step that falls well short of the kind of material precondition of payment that I think that the Ninth Circuit cases require here. And the danger of, in this area, as Judge Chin, you know, in his 65 cases of holdings, I think what he identified ultimately, and what bothered the First Circuit in D'Agostino, is it's going to require the court to determine the materiality of something that the FDA has already decided isn't so material as to point of approval. The FDA tells patients and doctors, you know, it's not uncommon for there to be these minute manufacturing deficiencies. But for a variety of reasons, it's very important that you continue taking your medication and there is no allegation in the complaint. For example, the government standard here is basically, well, if there's a serious public health risk, which is pretty close to the worthlessness standard, there's no allegation in this complaint that the products never worked, that they did not suppress the HIV viral load that continues to save lives in this community and around the world. There is no allegation in this complaint. There are allegations in the new traces of arsenic or the new traces of cement and other things that get into the manufacture of medicines every day. There's no allegation that anyone was hurt. There's no allegation that the strength wasn't there that patients... That makes sense. That the FDA through the NDA approves a formula and a place and a manner as to how the pill is to be manufactured. And you're saying, well, it really doesn't matter. We can do it any way we want. Well, I don't think I'm saying that. The FDA approves medicines. They don't approve production sites. There can be situations where, post-approval, you have to file this PA. As you file things, you inform the FDA. If the FDA and the Justice Department think that something was egregious or that the FDA was misled,  they have the ability to call, recall, or to say, I'm not paying for that. Or to say, we think you really misled the FDA. We're going to go prosecute you. So you can't do whatever you want because that's why we have an FDA and the Justice Department to calibrate the enforcement here. But if you allow a private party completely unmoored from understanding the significance of these issues or in legal terms, the materiality of these issues, then the courts are going to enmesh themselves in second guessing the materiality of the terminations. Of course, I'm not saying you can do whatever you want. There can be many, many enforcing weapons that the FDA has. Obviously, prosecution by the Justice Department. Of course, none of that happened here in, I think, one S. Bar. Do you plan to file any exposure of what you were doing because you just stopped doing it? Well, Your Honor, according to the complaint, the manufacturing deficiencies have already been corrected. According to the complaint, really, I filed an amended regulatory document. But the government obviously knew about disasserting bills. I think that in the filing of the complaint, they kept paying. The act for a single ingredient, according to the relators, kept going. Government did nothing. That's part of the problem. Some of the reasons we haven't seen it, because sometimes the government doesn't think it's needed. Sometimes there's lots of people who are supposed to exist in government regulation and try to get rid of government regulation. And that's why we haven't acted like this. So when the government doesn't act, the projects in this instance can't bring about the conformity that this must bring. Your Honor, and I'm not asking the court. That's an important point. But obviously the courts have rules around what has to be a material precondition of payment. And there are rules around how material the disrepresentation has to be. And what I am asking the court to do is to think very carefully, in this particular instance, where it's not a material precondition of payment, where the drug remained approved, and where the FDA has the kind enforcement discretion. The First Circuit's opinion in D'Agostino that was recently issued goes on and on about, in this particular area, absent a contract that has these specifications, that's how narrowly the court can rule. The court can say, well, I'm not going to reach the outer edges of how worthless the product needs to be. I don't need to go there. What I can do is I can affirm, because here the product clearly remained approved, and there was no contract or specification that was violated. And under those narrow circumstances, approval is appropriate, right? I asked you about another quote from Justice Thomas, which goes to the argument you're making. When, as here, a defendant makes representations in submitting the claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis of liability if they render to the court with respect to the goods or services. That doesn't say you have to have a contract, or you have to have, it says you can make misrepresentations to the FDA, and that can be a basis of liability. Why isn't that the case here? Well, that's the general principle that, of course, the court can hold. But what the courts do is put some parameters around that by saying, well, number one, it has to be that the misrepresentation has to be a material precondition of payment. Judge Chaik didn't rule, didn't discuss this case, because it was submitted to the sixth floor of HHS, the 77th floor of HHS. That's not why he ruled. The reason he ruled was because the statements to the FDA were not material preconditions of payment. So your Honor can still uphold the principle in SBAR, while still employing the Ninth Circuit's existing cases to say, well, it has to be a material precondition of payment. In FedNow, which was the promissory floor, it was the Department of Education, they cited a contract, an agreement, and a regulatory provision that were very specific and that were allegedly violated. Okay? So you look at those documents to guide the very principle that your Honor has announced. Thank you. Thank you, Your Honor. Just a couple of quick points. The first, Mr. Fuzzard, suggests again and again that there's tremendous risk here if you rule in our favor. In reality, there's virtually none. If the government really doesn't like a lawsuit under the False Claims Act, the government can always spike the lawsuit. Later on in this case, if it emerges that the FDA actually thinks these violations were not material at all, we're going to lose. But at this pleading stage, there is no doubt in anybody's mind, I think, that we have alleged material violations of the False Claims Act. And when those happen, the real risk to public health, to the public fisc, is accepting the other side's position, which is that they simply are inactual, barring these contrived parameters. And one example is, Mr. Fuzzard says, unless there is a specific contract specification that tells you exactly how much margin you're allowed to put in the bill, you just can't have a false claim. That is in the teeth of the Escobar decision, specifically the part of it that says, it doesn't have to be an express condition of payment in order to give rise to a False Claims Act claim. What you have to have is you have to have material regulatory violations. The terms of NDA approval are very specific. The statutes dealing with adulteration and spamming are very specific, and they outline for you exactly how deviations from those norms do result in regulatory violations. When those violations are material, they can be actionable if, and this is the other equally important point, and I don't want it to get lost in no one's talked about it yet, but it's critical. What we're not talking about here are just regulatory violations in the abstract. We're talking about regulatory violations accompanied by a systemic campaign to conceal them from the government and to obtain public funds notwithstanding those violations. It is the false claims that are actionable here. And so there is no risk whatsoever that a ruling in our favor is going to transform every regulatory violation into a False Claims Act case. It has to be accompanied by a willful deception of the government, which is what the complaint bill has just upped down, and this is also what limits the scope of the statute properly to Congress's objectives. Thank you. Thank you, Judge. Thank you for that. Thank you both. Appreciate it very much.
judges: Reinhardt, Tashima, Molloy